[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff commissioner of motor vehicles commenced this action on January 19, 1989, seeking, in the first count, to recover its cost for removing junked motor vehicles and parts stored on the unlicensed portion of the defendant's property in Hartford, on which the defendant operated a motor vehicle junkyard and, in the second count, to foreclose a mortgage of the property given by the defendant to secure its bond of $100,000 to cover the cost of such removal.
In a prior action by the commissioner against the defendant, No. 327671, State of Connecticut, Commissioner of Motor Vehicles v. De Milo Company, Inc., the court, Ripley, J., on June 8, 1987, rendered judgment that the defendant had been operating a motor vehicle junkyard in violation of subdivision H of chapter 246 (General Statutes 14-67g-14-67w) and had created a public nuisance. In a prior proceeding in that action on February 26, 1987, the court, Aronson, J., had issued a temporary injunction ordering the defendant to remove all vehicles and auto parts stored outside its licensed premises, but it had never complied with that injunction.
The order of June 8, 1987 directed that the commissioner be authorized to remove the vehicles and parts stored on the unlicensed portion of the defendant's CT Page 4919 property "at the expense of the defendant." It also required that the defendant post a $100,000 bond "to cover the cost of immediately eliminating the conditions which constitute a violation" of the statutes pertaining to motor vehicle junkyards. On June 10, 1987, the defendant appealed from that judgment and also applied for a stay of the order contained therein, which was denied, Ripley, J., on the same date. The Appellate Court on February 4, 1988, dismissed the appeal as moot and the Supreme Court denied certiorari.
The defendant complied with the provision of the order requiring it to post a bond of $100,000 to cover the cost of remedying the statutory violations. It provided such a bond, secured by a mortgage of its property in Hartford, on September 9, 1987. The condition of the bond is that the defendant pay to the state "the just and full sum to comply with the referenced court order." The defendant does not claim to have fulfilled this condition but nevertheless, disputes its obligation to make any payment to the state.
The evidence at trial established that on June 10, 1987, two days after the judgment authorizing removal of the vehicles and parts from unlicensed portions of the defendant's property had been filed, Howard Nicholson, acting on behalf of the department of transportation (DOT), ordered the general contractor for the reconstruction of I-91 in the Hartford area, to begin the removal operation. (Nicholson). The DOT was involved because its plan to construct a new service road (Liebert Road), which would cross a small portion of the defendant's property, required that the vehicles and other objects within the intended roadway be cleared therefrom. (Id.) By eminent domain the state on August 1, 1985, had taken a triangular parcel constituting the southeasterly corner of the defendant's rectangularly shaped property, as well as some adjoining property leased by the defendant from the Barilla family, on which its vehicles were also stored, for the purpose of constructing this service road. (Hartford Superior Court, No. 312894).
The general contractor initially cleared the land taken for the roadway by bulldozing most objects within the taking lines onto property on the east side of the new CT Page 4920 service road leased by the defendant, where its other junked vehicles and parts were stored. (De Milo; Ex. Q9, 29). The removal of the vehicles and parts by DOT to a temporary storage area began on the same day. Some of the automobiles were placed on flatbed trailers with cranes and others were loaded onto dump trucks. (Ex. Q6, Q7, Q8). Payloaders were used to load the used auto parts and loose tires onto the dump trucks. (Ex. Q10). The DOT had obtained permission from the City of Hartford to use property owned by the city, located about two hundred yards south of the De Milo property, as a temporary dumping ground for the material removed from the De Milo property. (Nicholson, Ex. P, Q4). By June 18, 1987, one large pile and two smaller piles of junked auto parts and cars had been formed from the materials deposited on the city property. (Ex. Q3, Q4, Q5). Another large pile that had resulted from the clearing of the roadway by pushing vehicles and other objects onto the property that De Milo had leased remained at the northeast corner of the new service road and Saybrook Street until the spring of 1988. (Ex. 9, 30).
In November, 1987, the department of motor vehicles (DMV) began to solicit bids for the permanent removal and disposal of the piles of junked vehicles and parts. (Ex. L). The assistant attorney general assigned to the DMV advised that compliance with General Statutes 4a-57, which specifies a competitive bidding procedure, with advertising and sealed bids, for all state purchases of contractual services exceeding $10,000, with exceptions irrelevant to this case, was not necessary. (Ex. O). Accordingly, bids were solicited from three licensed auto salvage firms as follows: S. Kasowitz Sons, $585,000; Chuck Scraps Dealers, Inc., $230,000; and Essex Auto Salvage, Inc., $224,900. (Ex. I, V, K). The DMV selected the lowest of these bids and on March 30, 1988, executed a written contract with Essex Auto Salvage, Inc. to remove and dispose of the used vehicles and parts outside the fenced area of the De Milo property by June 30, 1988. (Ex. M). Essex submitted an invoice for completion of this work in May, 1988, and payment was made of the contract price from funds supplied by the DOT. (Yacavone). The DMV had arranged for this transfer of funds because its budget made no provision for such an expenditure. (Id.) CT Page 4921
 I
The first count of the complaint is based on the following provision of General Statutes 14-67v:
 In addition to the penalties herein prescribed, the commissioner of motor vehicles or the local authority, upon a violation of any of the provisions of this subdivision (H), may bring an application to the superior court for the judicial district where such yard or business is located to enjoin a further operation or maintenance of such yard or business and to abate the same as a public nuisance. Said court may, upon finding such yard or business has been established, operated or maintained in violation of the provisions of this subdivision (H), issue such injunction as it deems equitable and make such order for the discontinuance or abatement of such yard or business as a nuisance as it finds to be necessary, including authorization to the commissioner of motor vehicles to enter such yard or business to eliminate, at the expense of the defendant, the conditions which constitute the violation of any provision of this subdivision (H).
In the prior action (No. 327671), seeking injunctive relief pursuant to General Statutes 14-67v, the court authorized the commissioner to remove and dispose of the vehicles and parts found outside the licensed portion of the De Milo property "at the expense of the defendant." Because the defendant's appeal from that judgment was dismissed for mootness by the Appellate Court without a review of the merits, however, the commissioner cannot simply rely on that judgment as precluding by way of collateral estoppel the relitigation of issues relevant to this suit to recover the expenses of eliminating the violations of the junkyard statutes and regulations that had resulted in the issuance of the injunction. "Where a party to a judgment cannot obtain the decision of an appellate court because the matter determined against him is. . .moot, the judgment is not conclusive against him in a subsequent action on a different cause of action." Restatement, Judgments 69(2) (1942); see 46 Am.Jur.2d, CT Page 4922 Judgments 464; 157 ALR 1038, 1043. "Once it is determined that the case has become moot on appeal, . . .the appellate court should not decide the merits, and the unreviewed judgment should not command any further effect." Wright, Muller, Cooper, Federal Practice and Procedure 3533.10. Thus, contrary to the commissioner's claim, the defendant is not barred in this case from raising issues that may have been resolved against it by the trial court in NO. 327671.
At trial, the commissioner did not rely wholly upon the doctrine of collateral estoppel, but presented testimony and other evidence to prove that the defendant was violating the statutes and regulations concerning junkyards. Howard Koening, a DMV employee, testified that he and other DMV employees had visited the De Milo property and had found that the defendant was storing vehicles and parts outside the boundaries of the premises for which its license to operate had been granted. He testified that a sketch of the property in the DMV file, Exhibit D, shows the area to which the defendant's junkyard permit applied as a rectangle outlined in red. The sketch, which was made prior to November 20, 1986, indicates that approximately 225 vehicles and 300 engines and transmissions were stored between the easterly boundary of the licensed area and a "wooded area" approximately 300 feet farther east. (Ex. D). It also indicates that 146 additional vehicles were located along the north side of Saybrook Street and that 27 vehicles and 150 engines and transmissions were situated on the south side of Saybrook Street against a chain link fence separating Saybrook Street and Pump House Road.
Another sketch, Exhibit R, apparently made from notations penciled onto Exhibit D bearing the date, February 2, 1987, about three weeks before issuance of the temporary injunction on February 26, 1987, shows that the number of vehicles parked along Saybrook Street had been reduced to 105. Exhibit R indicates, however, that the number of vehicles in the area between the easterly line of the licensed premises and the wooded area had increased to 500 and that an additional 200 vehicles had been stored within the wooded area. An aerial photograph, taken by the witness Robert Moore on March 19, 1987, Exhibit Q, indicates that all but a few vehicles along Saybrook Street CT Page 4923 had been removed, though various parts, especially tires, were left spilling onto the street.
The evidence is overwhelming that the defendant was operating a motor vehicle junkyard on unlicensed property in violation of General Statutes 14-67i(a) as well as General Statutes 14-67r. The testimony of the defendant's principal officer, Frank De Milo, does not seriously contest this evidence. His testimony that the vehicles found by the DMV inspectors along Saybrook Street, as shown in the sketch, Exhibit D, had been left there by persons who had attempted to sell the vehicles to the defendant without the proper documents, is simply not credible, especially after examining Exhibit Q-1, the photo taken on March 19, 1987 which shows most of the vehicles to have been removed, while both sides of the street are littered with vehicle parts. The court concludes, therefore, that the defendant was operating its motor vehicle junkyard in violation of the regulatory statutes and that it made only a minimal effort to correct those violations called to its attention.
The remaining issue under the first count of the complaint, therefore, is the reasonableness of the amount claimed by the commissioner for removing the vehicles and other objects illegally stored by the defendant outside the area covered by its junk dealer's license. The commissioner claims that the reasonable cost for this work was $228,900, i.e. the $224,900 paid to Essex Auto Salvage, Inc. plus $4,000 for time spent by DMV employees supervising the removal. The fact that Essex submitted the lowest of the three bids received for performing the work involved is some evidence of the reasonableness of the amount paid. Also, payments actually made for work performed, in contrast to mere estimates, are ordinarily deemed competent evidence of reasonableness. "The cost of an article is ordinarily some evidence of its value." Devine Hallenbeck Co. v. Autoyre Co. 113 Conn. 97, 101
(1931).
It is true that DOT had obtained a lower estimate totalling $92,280 from Christie Rigging and Trucking Co. in March, 1986, but this figure was based on removal of cars and other items within a more limited area, apparently only the land required for the new roadway, and required only CT Page 4924 the relocation of the material "within the remaining De Milo site." (Ex. 26). At the prior proceeding in which the order of removal was issued, No. 327671, the defendant presented the testimony of Stanley Lesnewsky, who was engaged in the trucking, rigging and crane business, that it would cost $852,000 to move the vehicles and other items stored by the defendant on the adjoining Barilla property, which DOT had taken for the roadway, to a location on other property of the defendant about 150 feet to the east, where a junkyard had formerly been operated. (Ex. S). Neither the Christie bid nor that of Lesnewsky are of much significance, however, because the work involved was different from that performed by Essex and did not include the greater trucking distance required or the permanent disposition of the items moved.
 A.
In its second special defense, the defendant claims that the cost of removal was unreasonable because of the failure of DMV to comply with General Statutes 4a-57 which requires competitive bids for "[a]ll purchases of, and contracts for, . . .contractual services," with certain exceptions not pertinent to this case. The DMV did obtain three competitive bids, but did not fulfill the statutory requirements for "notice to prospective suppliers," posting such notice, sealed bids, public opening, and advertising when the amount of the purchase exceeds $10,000. The court is not persuaded by the commissioner's argument that, because he was acting under the court order pursuant to General Statutes 14-67v "to eliminate, at the expense of the defendant, the conditions which constitute" violations of the motor vehicle junkyard statutes, he could ignore the provisions of General Statutes 4a-57, which apply to "all purchases of . . .contractual services," unless a specified exception is applicable. Such competitive bidding statutes are mandatory and are intended to protect the public purse. Kelley v. Torrington, 80 Conn. 378, 382 (1968). The requirements of 43a-57 may be waived "[w]henever an emergency exists by reason of extraordinary conditions" by the commissioner of administrative services with the approval of the standardization committee, but no such waiver was obtained in this case even if the circumstances might have justified such a waiver. General Statutes4a-58. The court agrees with the auditors of public CT Page 4925 accounts that the failure to comply with 43a-57 cannot be excused or condoned. (Ex. 27).
The violation of 43a-57 by DMV, however, does not result in a forfeiture of the plaintiff's right to a judgment for the reasonable cost of removing "at the expense of the defendant" the illegally stored vehicles and parts pursuant to the court order. It would be nonsensical to construe a statute intended to conserve the state's funds as having such a strange consequence for the oversights of state employees responsible for its implementation. The court concludes that, although the failure to follow the procedures specified in 43a-57 is of some relevance on the issue of reasonable cost, it is not decisive and does not bar the commissioner from a recovery.
 B.
In its first special defense, the defendant claims that it should not be charged with the cost of removal because that work was performed in such a manner as to violate statutes and regulations pertaining to motor vehicle junkyards and also those regulating hazardous waste.
The claimed violations of the motor vehicle junkyard statutes and regulations are evidently based on the fact that when the material within the taking area for the roadway was cleared, much of it was simply pushed onto adjacent land and left in piles without regard to height and spacing regulations of DMV that apply to junkyards. Also, when the vehicles and parts were removed from the other unlicensed areas, they were simply deposited in piles without regard to such regulations. Despite the broad definition of "motor vehicle junk business" and "motor vehicle junkyard" in General Statutes 14-67g, the court is convinced that these statutes and the regulations implementing them were never intended to apply to the temporary storage of vehicles and parts removed by DMV from unlicensed premises for the purpose of abating a public nuisance, as in this case. It would be absurd to require DMV to obtain a junkyard license pursuant to General Statutes 14-67i or comply with the various requirements of the plethora of statutes and regulations referred to by the defendant in its pleading, when its sole objective was to CT Page 4926 eliminate violations by the defendant that had been found to constitute a public nuisance. The plaintiff never intended to operate a motor vehicle junkyard business and never did so in fact. Because the items removed were being stored temporarily until they could be disposed of permanently by a licensed salvage company, there was no need to comply with height and spacing regulations applicable to those engaged in the business of operating motor vehicle junkyards.
The hazardous waste statutes referred to by the defendant in its special defense are General Statutes22a-116-1 et seq., 22a-117 and 22a-122-1 et seq. These statutes pertain to the siting and licensing of hazardous waste facilities. How they are relevant to any issue in this case is an enigma not elucidated by the defendant during trial or in its post-trial briefs.
Two exhibits introduced into evidence indicate that some of the soil removed from the De Milo property by DOT in order to construct the new service road contained hazardous-waste. (Ex. 4, 5). These exhibits do not indicate that the soil contamination occurred as a result of any activity of DMV or DOT. It may have resulted from the spilling of battery fluids or the leaking of metals that had occurred in the course of the defendant's activities in operating its junkyard for many years. The defendant has simply failed to prove any violation of the environmental statutes by either of the state agencies involved in the removal work. It has also failed to advance any tenable legal theory that would warrant denial of the plaintiff's claim for the costs of removal even if its activities had caused the soil contamination that was discovered. There is no evidence that the defendant was aggrieved in any manner by the removal of the contaminated soil.
 C.
In its third special defense, the defendant claims that the plaintiff removed materials from areas not covered by the court order to "crush, remove and dispose of any junk vehicles, or parts of vehicles, found on unlicensed areas." (Ex. E). There is ample evidence that all of the items removed were situated on the unlicensed portions of CT Page 4927 the property owned or leased by the defendant, except those within the taking area of the new service road, which the defendant had continued to use as a storage area after the date of condemnation. (Koening; Ex. D). There were also some vehicles and parts that the defendant had stored along Saybrook Street. (Ex. D, Q4). All of the objects removed had been stored by the defendant in "unlicensed areas" and there is no evidence that anything was taken from the area covered by its license.
The defendant argues that, although the initial movement of the vehicles and parts from the unlicensed areas of the De Milo property and adjoining leased properties may have been authorized by the court order, the later movement by Essex in April, 1988, was beyond the scope of the order. Because the order authorized the commissioner "to immediately enter the unlicensed areas" and "to immediately eliminate" conditions that violated the motor vehicle junkyard statutes, the defendant maintains that it is not liable for the cost of the work performed by Essex almost a year after the order. It claims that: (1) the storage area on the property of the city of Hartford, to which the vehicles and parts had been transported within approximately two months after issuance of the order and from which the major portion of the illegally stored items were removed by Essex, was not intended to be included in the phrase "unlicensed areas;" and (2) the removal by Essex was not within the authorization "to immediately enter" and "to immediately eliminate" the violations found, because it did not take place until almost one year after the order, a time interval not encompassed by the adverb "immediately."
The court is not persuaded by these ingenious but, nevertheless, superficial arguments of the defendant. The evidence is clear that DOT, as authorized by DMV, did enter on June 10, 1987, the unlicensed portions of the defendant's premises and other land on which it had stored vehicles and parts, two days after filing of the order. By June 18, 1987, two large piles of the material removed had accumulated in the temporary storage area on the city property. (Ex. A3, Q4, Q5). Substantially all of the vehicles and parts had been cleared from the unlicensed areas by that time, except for a large pile of junk at the northeast corner of the new service road and Saybrook Street, composed of items bulldozed from the area taken for CT Page 4928 the roadway and vehicles and parts that the defendant had been storing there previously (Id.). That pile of material was not removed until April, 1958, when Essex performed its contract with DMV. (EX. Q2, 30).
The defendant does not claim that the time interval of approximately two months used by the commissioner to "enter" its property and to "eliminate" the conditions thereon that violated the statutes was too long for that work, which was accomplished by DOT, to have been within the scope of the authorization to act, pursuant to the order, "immediately." Recognizing that no reimbursement is sought for the expenses incurred during that two month period, the defendant seeks to isolate the work performed by Essex in April, 1988, from the circumstances that made such work necessary. Such an interpretation of the order, however, defies common sense. The text of the order does not place any time limit on the expenses of the commissioner for which the defendant is liable, so long as they are reasonably related to the elimination of the violations of the statutes and regulations found by the court. Without belaboring the obvious, it is quite clear that the work performed by Essex in April, 1988, was within the scope of the court order as well as the statute, General Statutes 14-67v, allowing reimbursement for the cost of such work. The removal and disposition of the defendant's junk that had been stored temporarily on city property was an integral part of the operation authorized by the court "to crush, remove, and dispose of any junk vehicles, or parts of vehicles, found in unlicensed areas." (Ex. E).
 D.
In its fourth special defense, the defendant claims that the commissioner should be equitably estopped from claiming reimbursement for the expenses of implementing the court order. The basis alleged for this estoppel claim is that the plaintiff "moved the property in violation of the automatic stay proceedings" and, as a result, the defendant's appeal from the order of removal in No. 327671, was dismissed by the Appellate Court for mootness, thus depriving the defendant of an opportunity to challenge the order on appeal. This reference to "automatic stay proceedings" in this pleading overlooks General Statutes CT Page 492952-477, which provides that a stay of the operation of a judgment for a permanent injunction may be granted only upon an application for such a stay, thus exempting injunction proceedings from the automatic stay provisions of P.B. 4046. This misconception of the defendant leaves no basis for its claim of estoppel as pleaded. More directly to the point, however, is the fact that its application for a stay was denied on June 10, 1987, the date DOT began to clear the roadway.
In its post trial briefs the defendant does not claim there was an automatic stay as a result of its appeal in No. 327671, but claims as a basis for estoppel that the plaintiff misrepresented the situation in its brief to the Supreme Court dated March 4, 1988, opposing the defendant's petition for certiorari to appeal the Appellate Court's dismissal of the appeal in No. 327671 for mootness. That brief dated March 4, 1988, contains the statement that "[i]n this appeal, the Injunctive order has been almost completely executed, [and] the personal property of De Milo has been removed and disposed of . . . ." (De Milo's Memorandum of Law after Trial, April 14, 1993, pp. 37-39; Defendant's Reply Memorandum, April 30, 1993, pp. 13-14). The defendant's claim of misrepresentation is based on the fact that, when the quoted statement was made, the vehicles and parts stored on the city property had not yet been removed by Essex, which began its work in April, 1988. The statement is inaccurate only with respect to the pile of junk situated on the northeast corner of the new service road and Saybrook Street, which remained there at least until April 11, 1988. (Ex. 30). The remainder of the vehicles and parts had been removed to the city property and had been "disposed of" in the sense that arrangements were being made for their ultimate disposition by Essex. (Ex. M). The defendant's principal officer, Frank De Milo, worked on the premises daily and could not have been misled by these inaccuracies. If they were of any significance, his counsel would presumably have informed the Appellate Court and the Supreme Court. There is nothing to indicate that the Appellate Court was misled when it dismissed the appeal, suo motu, for mootness. The defendant has never claimed that any practical relief could have been obtained on that appeal. The issue before this court of the defendant's liability for the work performed by Essex could hardly have been resolved in that case, since the work had CT Page 4930 not been performed at the time of dismissal. Furthermore, since this court has determined that the judgment in No. 327671, because of the lack of opportunity for appellate review resulting from the dismissal for mootness, carries no collateral estoppel effect on the issues in this case, it is difficult to understand how the defendant has been prejudiced by that dismissal. The court has decided that there is no merit to the fourth special defense.
From all the evidence, the court concludes that the commissioner's expenditures of $224,900 to Essex for removing and disposing of the vehicles and parts temporarily stored by DMV on the city property as well as those removed from property owned or leased by the defendant and those he had strewn along Saybrook Street was a reasonable price to pay for the work involved. With respect to the $4,000 claimed for the time spent by DMV in relation to the removal work, however, the evidence is insufficient to justify any award. There is no testimony of the basis of the sum claimed nor were any records presented concerning the time spent by DMV employees on the job or the hourly costs for their work. The figure of $4,000 appears to have been plucked from the air and to be nothing more than a guess. Bianco v. Floatex, Inc.,145 Conn. 523, 524-25 (1958). The plaintiff, therefore, is entitled to recover from the defendant $224,900 with interest from January 19, 1989, the date of service of the complaint.
 II
With respect to the second count, which seeks a foreclosure of the mortgage given by the defendant to secure its performance of the bond it posted pursuant to the judgment in No. 327671, the court finds that the disputed allegations have been proved. The condition of the bond is that De Milo shall pay to the state "the just and full sum" to comply with the court order. The court has found in the first count that that sum is $224,900 plus interest, an amount in excess of the $100,000 bond. The defendant has paid nothing to date.
The property of the defendant that has been been mortgaged to secure the bond has a value of $300,000, according to the testimony of the only witness on that CT Page 4931 subject. (De Lucco).
The court on the second count finds that the condition of the bond has not been fulfilled and that the debt secured by the mortgage is $100,000. The state has filed a motion for foreclosure by sale, which the defendant has not thus far opposed. At the present time the court will order a foreclosure by sale, subject to revision if the defendant should prefer a strict foreclosure. As there may be an appeal, the court will await the expiration of the appeal period before appointing a committee or setting the time and conditions of the sale. Those aspects of the judgment will be determined after a further hearing. Counsel for the plaintiff is directed to prepare and submit the judgment file.
It is ordered that, on the first count, judgment enter for the plaintiff to recover from the defendant the sum of $224,900 with interest from January 19, 1989, the date the action was commenced, plus costs.
On the second count, it is ordered that a judgment of foreclosure by sale enter for the plaintiff for a debt of $100,000 (being part of the indebtedness found in the first count), together with costs including an appraisal fee of $250, which the court finds reasonable.
David M. Shea State Trial Referee